AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **1:21-MJ-00573** |
| 3154 Gobel Avenue, Apartment 4, Cincinnati, Ohio 45211 | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to possess with intent to distribute |
| 18 U.S.C. §§ 1956 and 1957 | Money laundering and conspiracy |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Cameron C. Rice*
_____
*Applicant's signature*

Cameron C. Rice, SA DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime.

Date: **Jul 30, 2021**

*Stephanie K. Bowman*
_____
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman, United States Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Cameron C. Rice, Special Agent with the Drug Enforcement Administration, being first duly sworn, hereby state:

1.      This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits and instrumentalities of a crime, persons to be arrested, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute, and distribute methamphetamine, and/or other controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846; and money laundering and conspiracy to do the same in violation of 18 U.S.C. §§ 1956 and 1957.

2.      For all the reasons outlined in this affidavit, I have probable cause to believe that evidence related to these crimes will be located within the following **Subject Locations**, which are more fully described in **Attachment A** (attached hereto and incorporated herein by reference):

   a.   3005 Boudinot Avenue, Apartment 1, Cincinnati, Ohio 45238 (**Subject Location 1**). I believe that evidence of Dion BANKHEADS's drug trafficking activities will be found at **Subject Location 1.**

   b.   3154 Gobel Avenue, Apartment 4, Cincinnati, Ohio 45239 (**Subject Location 2**).  I believe that evidence of Dion BANKHEAD's drug trafficking activities will be found at **Subject Location 2.**

3.      This affidavit is submitted in support of an application for a warrant to search the above listed **Subject Locations** more fully described in **Attachment A** for evidence, contraband, fruits and instrumentalities of a crime, persons to be arrested, property used or intended to be used in the commission of crime(s), as more particularly described in **Attachment B** (incorporated herein by reference). This affidavit is for the limited purpose of demonstrating probable cause. Therefore, I

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 1**

have not set forth each and every fact I have learned during this investigation, but only those facts and circumstances necessary to establish probable cause. The facts reported in this affidavit are based on my own knowledge, the knowledge of other law enforcement agents/officers involved in the investigation, and the use of Confidential Sources/Sources of Information.

## TRAINING AND EXPERIENCE

## INVESTIGATIVE BACKGROUND AND PROBABLE CAUSE

4.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the United States who is empowered by the law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

5.      I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since February 2018. Prior to being employed with the DEA, I was employed as a State Trooper for the State of Ohio for over two years. I graduated from Coast Guard Boot Camp, the Ohio State Highway Patrol Academy, American Military University, and the DEA Basic Agent Academy. As a Special Agent of the DEA, my duties and responsibilities include conducting criminal investigations for violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code. As a DEA agent, I have participated in several federal criminal investigations seeking evidence of violations of, inter alia, the Federal Controlled Substances Act (Title 21 of the United States Code).

6.      I am currently assigned to the Cincinnati District Office of the DEA. I received specialized training from the DEA, including the 18-week Basic Agent Training course. That training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers

**Affidavit of Special Agent Cameron C. Rice**                                     **Page 2**

derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and, the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

7.      During the course of my law enforcement career, I have participated in the investigation of several criminal offenses, including those involved in the current investigation. I have participated in several illicit drug trafficking investigations, ranging from street level dealers to major drug suppliers. These investigations include the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in the seizure of narcotics, arrests of suspects and their convictions, and the seizure of large amounts of U.S. currency; and have involved: the use of confidential informants; undercover agents; the analysis of pen registers and toll records; physical surveillances and the execution of search warrants.

8.      I have had discussions with other law enforcement officers and other cooperating individuals about the packaging and preparation of narcotics, methods of operations, and security measures which are often employed by narcotics traffickers I have examined documentation of various methods in which illicit drugs are smuggled, transported, and distributed.

9.      By virtue of my training and experience, through my conversations with and review of reports from other experienced agents and officers who conduct drug investigations, I have become familiar with the methods used by drug traffickers to import, transport, store, safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to collect, transport, store,

safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to obtain

and use telephones, pagers, computers, and other devices in order to communicate with each other;

and the jargon and/or codes commonly used when they refer to drugs and/or drug proceeds. As a

result of my experience, I have become familiar with the day-to-day operations and the various

tools, methods, trends, paraphernalia, and related articles used by various traffickers in their efforts

to manufacture, possess, import, conceal, package, use, and distribute controlled substances.

10.     The facts in this affidavit come from my personal observations, my training and experience,

and information obtained from other agents and witnesses. The sources of my information and

beliefs include oral and written reports about this and other investigations received from fellow

agents and Task Force Officers with the DEA. This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrant and does not set forth all of my knowledge

about this matter.

11.     The following statement of facts and circumstances detail the involvement of certain

individuals in drug trafficking and the use of the **SUBJECT PREMISES** to facilitate those drug

trafficking activities. Based on my training and experience, my participation in this investigation,

as well as information I believe to be reliable based on oral and written reports about this

investigation and other investigations, physical surveillance conducted by federal/state law

enforcement agencies, telephone toll records and subscriber information, location data obtained

from GPS tracking devices, public records, and law enforcement databases, I know the following:

### A. Investigation Overview: BANKHEAD DTO Sources Methamphetamine Throughout Cincinnati

12.     Such belief is supported by the following facts and probable cause: Police Officer Jonce

Tackett, a Cincinnati Police Officer, and myself, both with extensive training and experience

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 4**

investigating drug trafficking offenses, are currently involved in an ongoing drug trafficking investigation involving suspects Steven EDMERSON, Dion BANKHEAD, and Zyon LYLE.

13. Starting in July of 2020, agents/officers initiated an investigation into the Steven EDMERSON Drug Trafficking Organization (DTO). With the assistance of the DEA, agents/officers opened an investigation to identify the roles of individuals in the DTO. Over the course of the investigation, agents/officers identified multiple individuals engaging in illegal drug trafficking throughout the United States.

14. On August 27, 2020, a fellow officer observed a silver 2014 Chrysler 300 bearing Ohio license plate JNR8741 registered to Dion BANKHEAD (hereinafter referred to as Target Vehicle #1). Target Vehicle #1 pulled to the curb in the 800 block of Livingston Street in the West-End neighborhood of Cincinnati, Ohio. Officers observed an unknown male black approach the passenger side of Target Vehicle #1 and reach into the vehicle and conduct what officers believed to be a hand-to-hand drug transaction with the driver of Target Vehicle #1, later identified as Dion BANKHEAD. The unknown male black then reviewed the contents of the transaction in his hand and departed the area. A fellow officer observed Dion BANKHEAD commit an equipment violation while driving Target Vehicle #1 and conducted a lawful traffic stop at 2029 Dunlap Street.

15. At PO Tackett's request, Cincinnati Police Drug K9 Officer Dane Billingsley and his partner, Yaro, were asked to conduct an open-air sniff around the exterior of Target Vehicle #1. The K9 handler advised PO Tackett that his drug detection K9 alerted to the presence of an illegal drug emanating from the passenger side front door seam. A lawful search was conducted on Target Vehicle #1. Upon search of the vehicle, officers found a digital scale with white residue in the vehicle. The digital scale was transported to the Hamilton County Coroner's Lab for analysis. PO

Tackett received a confirmation of lab results in County Lab # CL20-05063, indicating the presence of tetrahydrocannabinol, a schedule I-controlled substance, and cocaine, a schedule II-controlled substance.

### B. Interceptions over EDMERSON's Facebook Shows the Distribution of Drugs Throughout Cincinnati

16.     On September 11, 2020, PO Tackett appeared before Hamilton County Common Pleas Judge Leslie Ghiz, who reviewed and signed a search warrant authorizing the historical records, GPS location Pings, and trap and trace for Facebook Profile ID: 100017957433273 believed to be used by Steven EDMERSON. The search warrant directed Facebook, Inc. to provide information associated with the Facebook profile believed to belong to Steven EDMERSON. On September 12, 2020, agents/officers received the requested records, GPS locations, and trap and trace for Steven EDMERSON's Facebook ID: 100017957433273. Agents/officers reviewed multiple conversations about the illegal purchasing and selling of illegal narcotics. Additionally, a conversation between Steven EDMERSON's Facebook ID: 100017957433273 and Linn Street Bankhead with Facebook ID: 100009441654395 talked about the buying and selling of illegal narcotics. Below is a part of their conversation:

| 07/30/2020 07:58:12 | 100017957433273 | Steve Edmerson | Man come buy this shit so we can get to the other shit |
| 07/30/2020 07:59:16 | 100009441654395 | Linn Street Bankhead | Imma buy it imma trying to but some head first |

17.     Agents/officers believe EDMERSON is telling "Linn Street Bankhead" to purchase the last quantities of illegal narcotics so EDMERSON can buy more. Agents/officers reviewed the publicly accessible Facebook account "Linn Street Bankhead" Facebook ID: 100009441654395. PO Tackett was familiar with a Dion BANKHEAD, a male, black, born July 29, 1989, from the traffic

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 6**

stop in August of 2020. PO Tackett reviewed the photos of the Facebook account "Linn Street Bankhead" ID: 100009441654395 and the recent Ohio BMV photo of Dion BANKHEAD and positively identified Dion BANKHEAD as the co-conspirator talking with Steven EDMERSON about illegal drug trafficking.

18.     Agents/officers searched Hamilton County Clerk of Courts records and learned Dion BANKHEAD has previous convictions for having weapons under disability (B0800339, B1505746) and felony trafficking in cocaine (B1505746).

### C. Interceptions over BANKHEAD's Facebook Shows the Distribution of Drugs Throughout Cincinnati

19.     On September 15, 2020, PO Tackett appeared before Hamilton County Common Pleas Judge Leslie Ghiz, who reviewed and signed a search warrant authorizing the historical records, GPS location Pings, and trap and trace for Facebook Profile ID: 100009441654395 believed to be used by Dion BANKHEAD. The search warrant directed Facebook, Inc. to provide information associated with the Facebook profile believed to belong to Dion BANKHEAD. On September 17, 2020, agents/officers received the requested records, GPS locations, and trap and trace for Dion BANKHEAD's Facebook ID: 100009441654395. Agents/officers reviewed multiple conversations about the illegal purchasing and selling of illegal drugs. Specifically, a conversation between Dion BANKHEAD Facebook ID: 100009441654395 and David Gullatte with Facebook ID: 100010114351428 talked about the buying and selling of illegal drugs. Below is a part of their conversation:

**Affidavit of Special Agent Cameron C. Rice**                                     **Page 7**



| Date/Time | ID | Name | Message |
|---|---|---|---|
| 07/06/2020 14:29:04 | 100010114351428 | Dave Gullatte | Cream in bra |
| 07/06/2020 14:29:17 | 100009441654395 | Dion Bankhead | Ticket |
| 07/06/2020 14:29:22 | 100010114351428 | Dave Gullatte | |
| 07/06/2020 14:29:43 | 100010114351428 | Dave Gullatte | Dave sent a photo. attachments/0016140628.jpg |
| 07/06/2020 14:29:43 | 100010114351428 | Dave Gullatte | Dave sent a photo. attachments/0016140628.jpg |
| 07/06/2020 14:29:46 | 100010114351428 | Dave Gullatte | Still wrapped |
| 07/06/2020 15:32:46 | 100009441654395 | Dion Bankhead | You phone number |
| 07/06/2020 15:35:02 | 100010114351428 | Dave Gullatte | 9372692882 |

20.     It is agents'/officers' training and experience that "cream" is slang for methamphetamine. Agents/officers believe "David Gullatte" is telling Dion BANKHEAD a shipment of methamphetamine has arrived and sent photos of bulk amounts of methamphetamine to Dion BANKHEAD. Additionally, David Gullatte gives the phone number (937) 269-2882 to Dion BANKHEAD for further discussions about the purchase of illegal narcotics.

Agents/officers searched for the Facebook page, "Dave Gullatte" with Facebook ID: 100010114351428. Agents/officers located publicly accessible photos of David Gullatte from the Facebook account. Agents/officers reviewed law enforcement databases and found a David Gullatte, a male, black, born July 12, 1986. Agents/officers compared the recent Ohio BMV photo of David Gullatte to the photos posted to the publicly accessible Facebook page, "David Gullatte"

**Affidavit of Special Agent Cameron C. Rice**                    **Page 8**

and positively identified David Gullatte as user of the Facebook account "David Gullatte" with ID: 100010114351428.

### D. Execution of Federal Search Warrants on the EDMERSON DTO's Residences

21.     On February 5, 2021, DEA Agents, Cincinnati Police Narcotics Unit Officers, and Ohio State Highway Patrol Troopers executed multiple search warrants for the arrest of Steven EDMERSON and his co-conspirators. Steven EDMERSON was arrested and transported to a Cincinnati Police facility located at 801 Linn Street. PO Tackett advised EDMERSON of his Miranda Warnings and EDMERSON stated he understood his rights. EDMERSON stated to PO Tackett that he was supplying multiple pounds of methamphetamine to an individual known to him as "BANKHEAD" up until the end of December of 2020. PO Tackett showed EDMERSON a recent Ohio BMV photo of Dion BANKHEAD. EDMERSON stated the image of Dion BANKHEAD is who he knows as "BANKHEAD" and who EDMERSON has been supplying with pounds of methamphetamine.

22.     Additionally, EDMERSON signed a written consent to search his phone and provided officers the pin code for his Apple iPhone for telephone number (513) 306-8384. The Apple iPhone was transported by agents/officers to the Criminalistics Investigation Sections of the Cincinnati Police Department where PO Utecht downloaded the phone. Agents/officers reviewed the contents of the phone and identified a conversation between Steven EDMERSON and Dion BANKHEAD from previously identified phone number (513) 800-9923. Below is the conversation:

**Affidavit of Special Agent Cameron C. Rice**                                                    **Page 9**

| Date/Time | Phone | Name | Message |
|---|---|---|---|
| 11/10/2020 20:41:35 | (513) 306-8384 | Steve Edmerson | Huh |
| 11/10/2020 23:55:17 | (513) 306-8384 | Steve Edmerson | Dam bra I been waiting since 9am |
| 11/11/2020 06:17:28 | (513) 306-8384 | Steve Edmerson | Want me to come down there bra? Tell me where I'm coming to? |
| 11/11/2020 14:44:04 | (513) 306-8384 | Steve Edmerson | I got the 4 what you want me to do about the other 52? |
| 11/11/2020 14:47:43 | (513) 800-9923 | Dion Bankhead | Either you come get it or you can you can wait til I sell it |
| 11/11/2020 14:47:57 | (513) 306-8384 | Steve Edmerson | Come get what? |
| 11/11/2020 14:48:56 | (513) 800-9923 | Dion Bankhead | Imma hit you when I make it |
| 11/11/2020 14:49:24 | (513) 306-8384 | Steve Edmerson | Aight how long so I can just be up front with them? |
| 11/11/2020 14:49:49 | (513) 800-9923 | Dion Bankhead | 2 days depends on how it go |
| 11/11/2020 14:50:35 | (513) 306-8384 | Steve Edmerson | Aight I'm bout to see something |
| 11/11/2020 14:51:01 | (513) 306-8384 | Steve Edmerson | ☐☐☐☐♪ You acting like you can't just pay for it |
| 11/11/2020 14:55:42 | (513) 306-8384 | Steve Edmerson | Emphasized "2 days depends on how it go " |

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 11/11/2020 | (513) 800-9923 | Dion | You told me I ain't have to give to so why |
| 14:55:45 | | Bankhead | you pay you act like you can't pay for it can't pay for it you could of keep it I was helping you you called me and told me you needed help you forgot |
| 11/11/2020 14:57:46 | (513) 306-8384 | Steve Edmerson | Yeah and you always said you was bout to come up here and buy some. And that message make no sense Buddy and you my brother I'm not trying to argue with you and I did pay I just gave up 15k of my own money on Sal |
| 11/11/2020 15:11:42 | (513) 800-9923 | Dion Bankhead | It ain't never bout that no money but you some petty shit right now bro I ain't arguing with you bout no money never would I ... but I'm talking bout business bra the way you do business it's like you pressing me I gave you 9 thousand so far don gave you 5 I gave you 4 niggas you giving that shit to taking ah week to move ah P but like I said if it's that serious you can grab this pound and sell it to somebody that got the money or you can wait bra you keep saying what you did that's beside the fact you acting like the you ain't gone get the money you gave me them pounds Friday night I gave you 9000 in 3 days what you saying nighas ain't that but I'm done talking you can either sell this mafuxka to somebody that got that cheese or wait ah couple days to get the rest it's yo choice bro |

23.     In this conversation BANKHEAD and EDMERSON are discussing pricing and payment of illegal drugs. Agents/officers believe EDMERSON is attempting to collect money from BANKHEAD to pay the source of supply. BANKHEAD tells EDMERSON he has not sold the rest of the illegal drugs and does not have the money yet to pay EDMERSON. BANKHEAD then

**Affidavit of Special Agent Cameron C. Rice**                                                          **Page 11**

tells EDMERSON "…I gave you 9 thousand so far don gave you 5 I gave you 4 niggas you giving that shit to taking ah week to move ah P but like I said if it's that serious you can grab this pound and sell it to somebody that got the money or you can wait bra…". Agents/officers are aware that "P" is slang for pound. Agents/officers believe BANKHEAD is telling EDMERSON he has given him $9,000 already, "Don" has given EDMERSON $5,000, and BANKHEAD stated if he has someone else that can move this last pound of illegal drugs, he will give it back to EDMERSON. Additionally, later in the same text thread, BANKHEAD provides EDMERSON with his new telephone number (513) 800-8894.

### E.  Probable Cause for Subject Location 1

24.     On February 24, 2021, agents/officers received information from a reliable and confidential informant (CI#1) regarding a methamphetamine trafficker by the name of Dion BANKHEAD operating in the Greater Cincinnati area. CI#1 is reliable and has aided on multiple independent cases which led to the recovery of illegal narcotics and US Currency from the illegal sale of narcotics. CI#1 continues to provide information on this case which has been found to be accurate and reliable. This information has assisted in collecting valuable evidence which will contribute to the arrest of the illegal drug trafficker known as Dion BANKHEAD.

25.     CI#1 stated Dion BANKHEAD is involved in the sale of bulk amounts of methamphetamine in the Greater Cincinnati area and uses telephone number (513) 800-8894 to coordinate methamphetamine sales with customers and co-conspirators. It should be noted this is the same number Dion BANKHEAD provided to EDMERSON in a Facebook message. Additionally, CI #1 stated Dion BANKHEAD uses the address 3154 Gobel Avenue (the structure that contains **Subject Location 2**) and stated BANKHEAD sells out of the apartment located at

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 12**

the top of the common entry doorsteps on the right-hand side. CI#1 stated BANKHEAD will sell half of an ounce of methamphetamine for $160.00.

26.     It is agents'/officers' training and experience that drug traffickers often use Facebook communications to facilitate their illegal drug trafficking operations. Agents/officers have executed multiple search warrants in the past that have shown illegal drug trafficking activity that have led to the arrest and prosecution of the suspects involved. Agents/officers have determined the Facebook account used by Dion BANKHEAD uses Facebook ID# 100009441654395. Agents/officers have previously shown BANKHEAD is using this Facebook account to communicate with customers, suppliers, and co-conspirators to facilitate the drug trafficking offenses.

27.     On March 10, 2021, PO Tackett appeared before Hamilton County Common Pleas Judge Tom Heekin, who reviewed and signed a search warrant authorizing the historical records, GPS location Pings, and trap and trace for Facebook Profile ID: 100009441654395 believed to be used by Dion BANKHEAD. The search warrant directed Facebook, Inc. to provide information associated with the Facebook profile believed to belong to Dion BANKHEAD. Agents/officers believe BANKHEAD is continuing to use his Facebook page to facilitate his drug trafficking as previously confirmed from the Facebook warrant signed September 15, 2020.

28.     On March 16, 2021, agents/officers received the requested records, GPS locations, and trap and trace for Dion BANKHEAD's Facebook ID: 100009441654395. Agents/officers reviewed multiple conversations about the illegal purchasing and selling of illegal drugs. Specifically, a continued conversation between Dion BANKHEAD Facebook ID: 100009441654395 and David Gullatte with Facebook ID: 100010114351428 continued to talk about the buying and selling of illegal drugs. Below is a part of their conversation:

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 13**

| 01/15/2021 11:26:55 | 100010114351428 | Dave Gullatte | It's in bra heavy fuck with yo Nicca cream 3800 |
| 01/30/2021 10:17:50 | 100010114351428 | Dave Gullatte | It's in come fuck with yo brother and em creams 3200 |
| 01/30/2021 10:18:09 | 100009441654395 | Dion Bankhead | Bring me 3 |
| 01/30/2021 10:18:52 | 100010114351428 | Dave Gullatte | I ain't driving bro I swear they all chunk |
| 01/30/2021 10:19:31 | 100010114351428 | Dave Gullatte | Send one of the hoes |
| 01/30/2021 10:19:42 | 100009441654395 | Dion Bankhead | Hold on |
| 01/30/2021 10:20:03 | 100010114351428 | Dave Gullatte | Trust yo brother it's big chunky |

29. As previously mentioned, it is agents'/officers' training and experience that "cream" is slang for methamphetamine. Agents/officers believe "David Gullatte" is telling Dion BANKHEAD a shipment of methamphetamine has arrived. Agents/officers believe when Gullatte provides the price "3200" he is telling Dion BANKHEAD the price of one pound of methamphetamine is $3,200. Dion BANKHEAD then directs Gullatte to bring him 3 pounds of methamphetamine. Agents/officers believe David Gullatte is a source of supply of methamphetamine for Dion BANKHEAD.

30. During the week of May 2, 2021, agents/officers spoke with CI#1 who confirmed Dion BANKHEAD is continuing to use telephone number (513) 800-8894 and stated BANKHEAD is continuing to use 3154 Gobel Avenue (the structure containing **Subject Location 2**) as a location to facilitate his illegal drug trafficking.

31. On May 7, 2021, at the direction of agents/officers, CI#1 contacted BANKHEAD via a one party, consensually recorded and monitored electronic communication. BANKHEAD and CI#1

**Affidavit of Special Agent Cameron C. Rice** **Page 14**

talked about CI#1 purchasing an amount of methamphetamine from BANKHEAD. BANKHEAD then directed CI#1 to call him via Apple Facetime to continue their conversation about the illegal drug transaction. According to CI#1, during the Apple Facetime call to BANKHEAD's phone number (513) 800-8894, BANKHEAD provided the price for methamphetamine. It is agents'/officers' training and experience that drug traffickers frequently use Apple Facetime calls to thwart law enforcement's ability to intercept live cellular phone calls. Agent/officers believe BANKHEAD directed CI#1 to call him via Facetime to continue their conversation about the illegal purchase of drugs.

32.     On June 4, 2021, PO Tackett appeared before Hamilton County Common Pleas Judge Tom Heekin who reviewed and signed a search warrant for historical records and electronic surveillance of cellular number (513) 800-8894. Information lawfully obtained pursuant to this search warrant included subscriber information, call history, tower locations, and 30 days of Real Time Precision GPS Tracking (Phone PING) data collection for the physical telephone handset using (513) 800-8894.

33.     During the week of June 6, 2021, agents/officers reviewed the lawfully obtained GPS Phone Ping for (513) 800-8894. The GPS phone ping indicated the handheld device was in the Westwood neighborhood of Cincinnati. Agents/officers drove to the area and located Dion BANKHEAD's gray 2014 Chrysler 300 bearing Ohio license plate JNR8741 (Target Vehicle #1) parked in front of 3005 Boudinot Avenue (the structure containing **Subject Location 1**).

34.     On June 21, 2021, PO Tackett appeared before Hamilton County Common Pleas Judge Meghan Shanahan who reviewed and signed a search warrant authorizing the installation of a global positioning system (GPS) electronic tracking device on Target Vehicle #1. This search

warrant authorized investigators to monitor the location of Target Vehicle #1 for a period of forty-five (45) days unless an extension was granted by the Court.

35.     On June 23, 2021, agents/officers reviewed the lawfully obtained GPS Phone Ping for (513) 800-8894. The GPS phone ping indicated the handheld device was again in the Westwood neighborhood of Cincinnati. Agents/officers drove to 3005 Boudinot Avenue, the location where Target Vehicle #1 was previously parked on June 6, 2021. Agents/officers again observed Target Vehicle #1 parked in front of 3005 Boudinot Avenue Cincinnati, Ohio 45238 (the structure containing **Subject Location 1**). At approximately 4:58AM, agents/officers installed the tracking device on Target Vehicle #1.

36.     During a review of the lawfully obtained GPS Phone Ping for (513) 800-8894 used by Dion BANKHEAD, agents/officers noted during the overnight hours for the period of June 5, 2021 through June 24, 2021, the handheld phone belonging to BANKHEAD predominately indicated the handheld device was in the vicinity of 3005 Boudinot Avenue Cincinnati, Ohio 45238 (the structure containing **Subject Location 1**).

37.     On July 7, 2021, officers/agents met with CI#2 for the purpose of identifying the target door inside the common entries for 3005 Boudinot Avenue (the structure containing **Subject Location 1**) and 3154 Gobel Avenue (the structure containing **Subject Location 2**). CI#2 is reliable and has aided on multiple independent cases which led to the recovery of illegal narcotics and US Currency from the illegal sale of narcotics. CI#2 continues to provide information on this case which has been found to be accurate and reliable. This information has assisted in collecting valuable evidence which will contribute to the arrest of the illegal drug traffickers known as Dion BANKHEAD and Zyon LYLE.

38.     Officers/agents outfitted CI#2 with an audio/video device and provided him/her with the target addresses. CI#2 traveled to 3005 Boudinot Avenue (the structure containing **Subject Location 1**) and entered the unlocked common entry door where s/he recorded the mailboxes belonging to the residences of 3005 Boudinot Avenue (structure containing **Subject Location 1**). Agents/officers reviewed the audio/video and observed a "Zaire B" posted on the mailbox to Apartment #1 (**Subject Location 1**).

39.     Agents/officers know, through social media posts on Dion BANKHEAD's Facebook account "Linn Street Bankhead," a female with the Facebook name, "Lovely Zibabes" with ID: 100001401537448 is in a relationship with Dion BANKHEAD. Agents/officers searched law enforcement databases and found a Zaire Brandon who currently resides at 3005 Boudinot Avenue, Apartment 1 (**Subject Location 1**). Agents/officers searched law enforcement databases and reviewed a recent Ohio BMV photo of Zaire Brandon. Agents/officers compared the photo to the photos posted to Dion BANKHEAD's and "Lovely Zibabes" Facebook page. Agents/officers identified the posted photos as Zaire Brandon. Dion BANKHEAD and Zaire Brandon are in multiple photos together confirming their relationship as boyfriend and girlfriend.

40.     Additionally, on July 7, 2021, agents/officers were conducting surveillance at 3005 Boudinot Avenue (the structure containing **Subject Location 1**) and observed Dion BANKHEAD and his previously identified girlfriend, Zaire Brandon, exit the common entry door of 3005 Boudinot Avenue.  Agents/officers observed Brandon getting into a black Toyota bearing Ohio temporary license plate M639647. BANKHEAD then kissed Brandon and walked back inside the common entry door of 3005 Boudinot Avenue (the structure containing **Subject Location 1**). Agents/officers believe Dion BANKHEAD lives with Zaire Brandon at **Subject Location 1**. Agents/officers believe this because Dion BANKHEAD and Zaire Brandon are currently in an

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 17**

ongoing relationship based on photos and their relationship status showing BANKHEAD and Brandon are currently engaged posted to their publicly accessible Facebook page.

41.     Based on my training and experience, and in speaking with other agents/officers; my knowledge that Dion BANKHEAD has been observed multiple times by agents/officers operating Target Vehicle #1; my knowledge that a digital scale with white residue that tested positive for tetrahydrocannabinol, a Schedule I controlled substance, and cocaine, a Schedule II controlled substance, was recovered from Target Vehicle #1; my knowledge that the handheld device belonging to phone number (513) 800-8894 used by BANKHEAD predominately  PINGed in the area of **Subject Location 1** during the overnight hours between the dates of June 5, 2021 and June 24, 2021; my knowledge that agents/officers have observed BANKHEAD entering and exiting the common door of 3005 Boudinot Avenue (the structure containing **Subject Location 1**); my knowledge that agents/officers have observed Target Vehicle #1 parked in front of 3005 Boudinot Avenue (the structure containing **Subject Location 1**) on numerous occasions through both physical and electronic surveillance; my knowledge that BANKHEAD and Zaire Brandon are in an ongoing relationship; and my knowledge that agents/officers reviewed the audio/video obtained by CS#2 from 3005 Boudinot Avenue (the structure containing **Subject Location 1)** and observed a "Zaire B" posted on the mailbox to **Subject Location 1**; I believe BANKHEAD is residing at **Subject Location 1** and using it in furtherance of his drug trafficking organization.

### F.  Probable Cause for Subject Location 2

42.     On June 8, 2021, CI#1 placed a one-party, consensually recorded Facetime call to BANKHEAD's handheld device (513) 800-8894 at agents'/officers' direction.  CI#1 stated an individual known to him/her as "Pacii" answered BANKHEAD's phone. "Pacii" stated to CI#1 that Bankhead is currently in jail for a short period of time. "Pacii" stated he can sell CI#1

methamphetamine and directed CI#1 to 3154 Gobel Avenue (the structure containing **Subject Location 2**).

43. Agents/officers are familiar with a Zion LYLE, born April 13, 1997, who goes by the name of "Pacii" and uses the Instagram account "Paciibabe" with Instagram ID # 1010445440. Agents/officers showed CI#1 a photo of Zyon LYLE that was posted to the "Paciibabe" Instagram account. CI#1 identified the photo of Zyon LYLE as who s/he knows as "Pacii". Additionally, agents/officers showed a BMV photo of Zyon LYLE to surveillance officers.

44. On June 16, 2021, agents/officers directed CI#1 to place a one-party, consensually recorded Facetime call to telephone number (513) 800-8894 which Zyon LYLE was using. During the conversation, LYLE agreed to sell CI#1 an amount of methamphetamine. Prior to the controlled purchase, agents/officers searched CI#1 for contraband and US currency with nothing found. Agents/officers provided CI#1 an amount of recorded US currency and a digital recording and monitoring device to be used during the controlled methamphetamine purchase. LYLE instructed CI#1 to meet him at a location within the City of Cincinnati. While under the constant monitoring and control of agents/officers, CI#1 traveled to the pre-determined meeting location to meet with LYLE.

45. Agents/officers observed LYLE arrive at the meet location in Target Vehicle #1. CI#1 got into the passenger seat of Target Vehicle #1 where CI#1 provided LYLE with an amount of US currency. LYLE instructed CI#1 to meet him on Gobel Avenue where LYLE would then provide CI#1 with the methamphetamine. CI#1 traveled back to the pre-determined meet location and met with agents/officers. Agents/officers attempted to follow LYLE away from the meet location in Target Vehicle #1 but noted LYLE would turn without signaling and drove at high speeds. Agents/officers were unable to maintain a visual of LYLE in Target Vehicle #1.

**Affidavit of Special Agent Cameron C. Rice** **Page 19**

46.     Agents/officers and CI#1 traveled to the previously identified address, 3154 Gobel Avenue (the structure containing **Subject Location 2**) to complete the illegal methamphetamine purchase from LYLE. Surveillance agents/officers observed Target Vehicle #1 park in the driveway of 3154 Gobel Avenue (the structure containing **Subject Location 2**).  CI#1 was again searched with no contraband or US currency found. CI#1 was outfitted with an audio/video device and traveled toward the meeting location.  LYLE and CI#1 entered the common entry door of 3154 Gobel Avenue (the structure containing **Subject Location 2**) and climbed the stairs to the top floor of the stairwell and turned toward the door on the right. On the audio/video equipment you can see LYLE proceed to use a key to enter the apartment. Agents/officers believe that LYLE used a key to enter **Subject Location 2**. Once inside, LYLE provided CI#1 with methamphetamine. CI#1 left the meet location and traveled to a neutral location while under constant monitoring and control by agents/officers. Agents/officers met with CI#1 where CI#1 immediately surrendered an amount of suspected methamphetamine and the digital recording device. Agents/officers searched CI#1 for contraband and US currency with nothing found. CI#1 confirmed to agents/officers that LYLE provided him/her with the suspected methamphetamine. The suspected methamphetamine was transported to the Hamilton County Coroner's Lab for analysis. Agents/officers received a confirmation of lab results indicating the presence of methamphetamine, a schedule-II illegal drug, in County Lab # CL21-4112.

47.     Following the controlled methamphetamine purchase, agents/officers reviewed GPS pings for the cellular phone (513) 800-8894 and learned the handset traveled with LYLE during and following the controlled methamphetamine purchase.

48.     Additionally, CI#1 stated there was an older female black inside the apartment during the controlled buy. Agents/officers conducted a search through a law enforcement database and

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 20**

received information Patrina Bankhead, a female, black, born January 23, 1968, is associated with **Subject Location 2**. Agents/officers searched juvenile records and learned Patrina Bankhead is Dion BANKHEAD's mother. Agents/officers showed CI#1 a recent Ohio BMV photo of Patrina Bankhead. CI#1 stated the image of Patrina Bankhead is who s/he has seen inside **Subject Location 2** where the controlled purchase took place. Additionally, the CI stated Patrina Bankhead is allowing LYLE and BANKHEAD to facilitate their drug trafficking in her apartment. Agents/officers are aware that drug traffickers will often use family member's residences to conduct their illegal drug trafficking business; specifically, family members who they believe they can trust with the storage of illegal drugs and proceeds of their drug trafficking.

49.     On July 6, 2021, agents/officers reviewed the lawful GPS Tracker placed on Target Vehicle #1. The GPS tracker showed the vehicle was parked near 3154 Gobel Avenue (the structure containing **Subject Location 2**). Agents/officers drove to the area to conduct physical surveillance on the location and observed LYLE and Patrina Bankhead standing in the common entry door to the residence.  A few minutes later, LYLE and Dion BANKHEAD exited the common entry door of 3154 Gobel Avenue (the structure contacting **Subject Location 2**) and got into Target Vehicle #1 and left the area.

50.     As previously mentioned in paragraph 37, on July 7, 2021, agents/officers met with CI#2 for the purpose of identifying the target door inside the common entries for 3005 Boudinot Avenue (structure containing **Subject Location 1**) and 3154 Gobel Avenue (structure containing **Subject Location 2**).  Agents/officers outfitted CI#2 with an audio/video device and provided him/her with the target addresses. CI#2 traveled to 3154 Gobel Avenue (the structure containing **Subject Location 2**) and entered the unlocked common entry door of 3154 Gobel Avenue (the structure containing **Subject Location 2**). CI#2 stated none of the doors to the apartments in the structure

**Affidavit of Special Agent Cameron C. Rice**                                        **Page 21**

containing **Subject Location 2** had an identifying number. CI#2 stated s/he walked to the top floor of the common entry stairwell and toward the door to the right (**Subject Location 2**), where the previous controlled buy occurred. CI#2 observed that **Subject Location 2**'s door now had a blue sheet over it. CI#2 exited the building and agents/officers recovered the audio/video device and debriefed CI#2. It should be noted both common entry doors to 3005 Boudinot Avenue (the structure containing S**ubject Location 1**) and 3154 Gobel Avenue (the structure containing **Subject Location 2**) were both unlocked and able to be accessed by anyone who attempted entry.

51.     During the week of July 11, 2021, agents/officers met with CI#1 to conduct a controlled methamphetamine purchase from Dion BANKHEAD and/or Zyon LYLE. On July 14, 2021, agents/officers directed CI#1 to place a one-party, consensually recorded telephone call to telephone number (513) 800-8894, previously used by both Dion BANKHEAD and Zyon LYLE. CI#1 stated Dion BANKHEAD answered the phone. During the conversation, BANKHEAD agreed to sell CI#1 an amount of methamphetamine and directed him/her to meet on Gobel. CI#1 knows this to mean to meet BANKHEAD at **Subject Location 2** based on previous controlled purchases conducted at this location. Prior to the controlled purchase, agents/officers searched CI#1 for contraband and US currency with nothing found. Agents/officers provided CI#1 an amount of recorded US currency and a digital recording and monitoring device to be used during the controlled methamphetamine purchase.

52.     Agents/officers conducted pre-surveillance on BANKHEAD's residence, **Subject Location 1**, and BANKHEAD's stash location, **Subject Location 2**. At 11:23AM, agents/officers observed BANKHEAD and LYLE exit the common entry door for 3005 Boudinot Avenue (the structure containing **Subject Location 1**) and get into Target Vehicle #1. CI#1 traveled to the stash location, **Subject Location 2**, at the direction of BANKHEAD. Surveillance agents/officers

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 22**

followed Target Vehicle #1 to 3154 Gobel Avenue (the structure containing **Subject Location 2**) where agents/officers observed Target Vehicle #1 park in the driveway. CI#1 met with BANKHEAD and LYLE and entered the common entry door of 3154 Gobel Avenue (the structure containing **Subject Location 2**). CI#1, BANKHEAD, and LYLE climbed the stairs to the top floor of the stairwell and turned toward the door on the right and went inside the apartment door, believed to be **Subject Location 2.** It should be noted, the blue sheet CI#2 observed over the door on July 7, 2021 was folded up at the top of the door. Once inside, CI#1 provided BANKHEAD with the US currency. BANKHEAD then placed a phone call to another individual and stated he needed one. BANKHEAD then stated to CI#1 that another illegal drug trafficker was on his way with the methamphetamine. A short time later, Bankhead stated the individual was outside of 3154 Gobel Avenue (the structure containing **Subject Location 2)** with the methamphetamine. CI#1 walked outside and met with a male black who provided CI#1 with the methamphetamine. CI#1 then returned to his/her vehicle and traveled to a neutral location while under constant monitoring and control by agents/officers. Agents/officers met with CI#1 where CI#1 immediately surrendered an amount of suspected methamphetamine and the digital recording device. Agent/officers searched CI#1 and CI#1's vehicle for contraband and US currency with nothing found. CI#1 confirmed to officers/agents that BANKHEAD took the US currency and directed another to provide CI#1 with the suspected methamphetamine. The suspected methamphetamine was transported to the Hamilton County Coroner's Lab for analysis.

53.    Based on my training and experience, and in speaking with other agents and officers; my knowledge that LYLE answered the handheld device with phone number (513) 800-8894 while BANKHEAD was in jail; my knowledge that LYLE was observed by agents/officers operating Target Vehicle #1 during the controlled narcotics buy with CI #1 on  June 16, 2021; my knowledge

that LYLE directed CI#1 to travel to **Subject Location 2** to complete the controlled narcotics buy on June 16, 2021; my knowledge that BANKHEAD directed CI #1 to **Subject Location 2** during the controlled narcotics buy on July 14, 2021; my knowledge that Patrina Bankhead is the mother of Dion BANKHEAD and is believed by agents/officers to reside at **Subject Location 2**; and my knowledge that CI #1 confirmed a BMV photograph of Patrina BANKHEAD was who was inside Subject Location 2 at the time of the controlled narcotics buy with LYLE on June 16, 2021; I believe that BANKHEAD and LYLE are using **Subject Location 2** in furtherance of their drug trafficking organization.

### G.    Additional Information on Subject Location 1 and Subject Location 2

54.    Based on the above facts, agents/officers believe Dion BANKHEAD and Zyon LYLE are currently involved in an illegal and ongoing conspiracy to store and distribute methamphetamine in the Greater Cincinnati area. Agents/officers believe Dion BANKHEAD and Zyon LYLE use Target Vehicle #1, the handset using cellular telephone number (513) 800-8894, **Subject Location 1**, and **Subject Location 2** to facilitate an ongoing illegal methamphetamine trafficking business. Based on the lawfully obtained information mentioned above, agents/officers believe that Dion BANKHEAD consistently stays overnight at **Subject Location 1**, with BANKHEAD's girlfriend, Zaire Brandon. Additionally, BANKHEAD and LYLE frequent **Subject Location 2** multiple times throughout the day based on physical surveillance and court authorized electronic surveillance conducted by agents/officers throughout the investigation of BANKHEAD and LYLE. Based on previous controlled buys, agents/officers know that BANKHEAD and LYLE store their methamphetamine inside **Subject Location 2,** where Dion BANKHEAD's mother, Patrina Bankhead lives.

**Affidavit of Special Agent Cameron C. Rice**                                    **Page 24**

55. It is agents'/officers' experience that drug traffickers commonly maintain residences where they store the proceeds and other quantities of contraband. It is agents'/officers' experience that illegal drug traffickers commonly store, prepare, and maintain illegal drugs, weapons used to facilitate illegal drug trafficking, packaging materials, records, cellular telephones and communication devices, currency derived from illegal drug sales and paraphernalia associated with illegal drug trafficking at locations in which they reside and in vehicles they operate and exert control over. Agents/officers therefore believe the items listed in this affidavit are currently at the locations for which this warrant is sought.

## **ITEMS COMMON TO SEARCH/SEIZE**

56. Based upon my training and experience, the training and experience of other law enforcement officers, and the facts contained herein, I know materials searched for and recovered in locations involved in drug investigations have included various controlled substances, including, but not limited to: methamphetamine and marijuana; drug paraphernalia such as scales, papers and drug packaging materials; books and records reflecting sales; the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of monies that are the proceeds from unlawful drug distribution; currency and money wrappers; records of transactions to conceal and launder drug trafficking proceeds; and various valuable assets purchased with the proceeds of unlawful drug trafficking. These items, obtained by search warrants, constituted evidence of Federal drug violations.

57. Based upon my training and experience, my participation in this investigation, and other drug trafficking investigations, I have reason to believe that:

**Affidavit of Special Agent Cameron C. Rice** **Page 25**

a.　　drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

b.　　drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.　　drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

d.　　drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, briefcases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

e.　　drug traffickers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following: written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

f.　　drug traffickers commonly use cellular phones to communicate with other members of the DTO, narcotics source(s) of supply, and/or narcotics customers in furtherance of violations of the Uniform Controlled Substances Act;

g.      drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.      drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.      drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j.      drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers' possession, their residence, and/or their place of business;

k.      drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and

**Affidavit of Special Agent Cameron C. Rice**                                        **Page 27**

restaurant receipts, photographs, canceled checks, maps and written directions to locations, rental car receipts, and luggage tags reflecting points of travel;

l.      drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns, and automatic weapons.  These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m.      it is common for drug traffickers to secret in their vehicles items identified in the above paragraphs;

n.      drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o.      drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p.      drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

q.      drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

## CONCLUSION

58.     I believe the facts contained within this affidavit support probable cause to believe that Dion BANKHEAD, Zyon LYLE, and their co-conspirators are involved in distributing methamphetamine.  Based on my training, experience, discussions with other law enforcement officers/agents, and the information contained herein, I believe that probable cause exists that the items listed in Attachment B will be found at the **Subject Locations** further described and identified in **Attachment A** and that these will constitute evidence of a conspiracy to possess with intent to distribute, and distribute methamphetamine, and/or other controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846; and money laundering and conspiracy to do the same in violation of 18 U.S.C. §§ 1956 and 1957.

59.     This is based upon information set forth herein, including surveillance conducted on all locations, information received from confidential and reliable informants, and from EDMERSON's cellular phones.  Agents/officers know that  Dion BANKHEAD and Zyon LYLE are using the **Subject Locations** in furtherance of their drug trafficking operations.  It is my belief that items of evidentiary value pertaining to illegal drug trafficking are located inside the **Subject Locations**.

## REQUEST FOR SEALING

60.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via

**Affidavit of Special Agent Cameron C. Rice**                                              **Page 29**

the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

### REVIEW AND APPROVAL

61. Special Assistant United States Attorney, Jacqueline Stachowiak, has reviewed this affidavit and the associated application and warrants and in her opinion, they are legally and factually sufficient. I respectfully ask the Court to authorize the requested search warrants.

_Cameron C. Rice_
Cameron C. Rice
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this  30th day of July 2021.
**via electronic means, specifically Facetime video.**

_Stephanie K. Bowman_

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

**Affidavit of Special Agent Cameron C. Rice** **Page 30**

# ATTACHMENT A

### Subject Location 1

#### 3005 Boudinot Ave, Apartment 1, Cincinnati, Ohio 45238

3005 Boudinot Avenue, Apartment 1, Cincinnati, Ohio 45238, further described as a single apartment located in an apartment complex. The property is red brick, stone, with off-white vinyl rectangular building with a white common entry door with no numbers outside the apartment complex. The address is identified as 3005 Boudinot Ave on the Hamilton County Auditor's Office with Parcel number 208-0060-0282-00. Upon entering the white common entry door, the door to apartment 1 is solid brown with a clearly marked "1" on the upper center portion of the apartment door.



**Subject Location 2**

**3154 Gobel Avenue, Apartment 4, Cincinnati, Ohio 45211**

3154 Gobel Avenue, Apartment 4, Cincinnati, Ohio 45211, further described as a single apartment located in an apartment complex. The property is a red brick rectangular building with yellow trim and two yellow garage doors with a white common entry door and glass in the middle of the door. A "3154" placard to the left of the common entry door. The address is identified as 3154 Gobel Avenue on the Hamilton County Auditor's Office with Parcel number 207-0B54-0002-00. Upon entering the white common entry door with glass, walk to the top floor of the multi-family and turn to the right. The door to apartment 4 is solid white door with no distinct marking or numbering.



# **ATTACHMENT B**

a. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

b. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs;

c. Cellular telephones, digital telephones, car telephones, or other communications devices which evidence participation in a conspiracy to distribute controlled substances.

d. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

e. Any computer equipment, digital device, magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and any other digital device capable of accessing the internet and capable of being used to commit or further the crimes outline above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes.

f. Financial instruments purchased with currency derived from the sale of controlled substances, including travelers' checks, bonds, stock certificates, cashier's checks, and certificates of deposit;

g. Money counting machines, money wrappers and rubber bands, boxes, bags, briefcases, suitcases, or containers used to carry controlled substances;

h. Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

i. Records, items, and documents reflecting travel for the purpose of participating in drug trafficking, including airline tickets, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations;

j. Handguns, shotguns and other firearms, and ammunition, which may be used to facilitate the distribution or possession with intent to distribute controlled substances;

k. Indicia of ownership and use of the vehicles, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, keys and bank account records, registration, title, insurance, and traffic tickets;

l. Photographs or video movies of drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

m. Controlled substances, including, but not limited to, methamphetamine and/or marijuana.

n. Drug paraphernalia, which can be used to store, package, weigh, dilute, and ingest controlled substances; equipment pertaining to methamphetamine and/or marijuana, and any other supplies related to the manufacture and distribution of said controlled substances.

o. United States currency, precious metals, jewelry, financial instruments and stocks and bonds; and

p. Any locked or closed containers, to include safes or lockboxes, believed to contain any of the above listed evidence